# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

JAHMAL GREEN,

        Defendant.

No. 06-CR-53-CJW-MAR

**MEMORANDUM
OPINION AND ORDER**

## I.     INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on June 16, 2020.  (Docs. 82, 83, 84, & 85).  On June 19, 2020, the government timely filed a brief in resistance.  (Doc. 87).  On June 29, 2020, defendant timely filed a reply.  (Doc. 91).  Oral argument was not requested and is not necessary.  *See* LR 7(c).  For the following reasons, the Court **denies** defendant's motion.[1]

## II.     RELEVANT BACKGROUND

On December 25, 2004, S.E. went to a home in Cedar Rapids, Iowa to purchase cocaine for $200, presumably from defendant.[2]  (Doc. 29, at 9).  Following the

---

[1] Although all the briefing on defendant's motion is submitted, he admits he has not yet exhausted administrative remedies as required under Title 18, United States Code, Section 3582(c)(1)(A) because 30 days have not yet elapsed since he submitted his request to the BOP on June 15, 2020.  (Doc. 83, at 3); *see also* (Doc. 91–1) (containing defendant's request to the BOP made by defense counsel on his behalf).  On June 23, 2020, the warden denied defendant's request.  (Doc. 94–1).  In light of the Court's denial on the merits, it will forego the exhaustion issue.

[2] The presentence investigation report ("PSR") does not state this information precisely but it appears defendant was the only other person involved in the transaction.  (Doc. 29, at 9).  The victim later identified defendant as the individual who assaulted her.  (*Id.*).

transaction, defendant accused S.E. of stealing $100 from his person. (*Id.*). As S.E. turned to leave, defendant allegedly hit S.E. in the back of the head with a hammer and S.E. lost consciousness. (*Id.*). When S.E. awoke, her boyfriend was carrying her to her car. (*Id.*). S.E. later reported that, while unconscious, defendant stole from her person $800 to $1,700 in cash and 85 hydrocodone pills. (*Id.*). On May 6, 2005, defendant twice sold cocaine to a confidential informant ("CI") from a residence within 1,000 feet of Coe College. (*Id.*). On May 18, 2005, defendant again sold cocaine to a CI. (*Id.*, at 10). On June 25, 2005, officers responded to a report of suspicious persons inside a vacant residence and found defendant, who was in possession of cash and cocaine. (*Id.*).

On May 4, 2006, a grand jury issued an Indictment charging defendant with three counts of distributing cocaine in violation of Title 21, United States Code, Sections 841(a)(1) and 851 and two counts of distributing cocaine near a school in violation of Sections 841(a)(1), 851, and 860(a). (Doc. 1). Count 2 charged defendant with the latter offense. (*Id.*). On May 8, 2006, officers arrested defendant. (Doc. 6). On May 9, 2006, defendant pleaded not guilty and was detained. (Doc. 7). On June 21, 2006, defendant changed his plea to guilty on Count 2. (Doc. 19). On July 6, 2006, the Court accepted defendant's plea. (Doc. 27).

On January 5, 2007, the United States Probation Office ("USPO") filed defendant's PSR. (Doc. 29). Defendant was, at that time, 31 years old and residing in Cedar Rapids, Iowa. (*Id.*, at 2). Defendant was raised by his mother. (*Id.*, at 19). He dropped out of school after eighth grade. (*Id.*, at 2, 20). Both of defendant's parents were deceased and he "had not seen his [three] siblings for a long time." (*Id.*, at 19). Defendant had two minor children with his girlfriend. (*Id.*). He reported he had never been formally employed and had "hustled" all his life. (*Id.*, at 20). Defendant's only significant health concern was his diabetes. (*Id.*, at 19–20). He had no mental health

concerns. (*Id.*, at 20). Defendant reported normal use of alcohol and frequent use of marijuana, about "one time per week a few times per month." (*Id.*).

Defendant's criminal history qualified him as a career offender. (*Id.*, at 12, 13–16). His criminal convictions consisted of the following: manufacturing and/or delivering cocaine at age 18; possession of cocaine at 19; possession of cocaine at 20; possession of an anabolic steroid, i.e. cocaine, at 21; manufacturing and/or delivering cocaine near a school or public housing also at 21; manufacturing and/or delivering cocaine also at 21; possession of cocaine at 27; interference with official acts for providing a false name to officers at 28; criminal trespass at 28; and frequenting a disorderly house (where officers found marijuana, cocaine, and cash) at 29. (*Id.*, at 13–16). Throughout these offenses, defendant often provided a false name to officers and attempted to hide cocaine from officers by, for example, putting it in his mouth or shoving in-between the backseats of a squad car. (*Id.*). Defendant's longest term of incarceration prior to the instant offense was just under five years. (*Id.*, at 15).

On January 31, 2007, the Court sentenced defendant. (Doc. 34). Defendant was in criminal history category VI with a total offense level of 34, yielding an advisory guideline range of imprisonment of 262 to 327 months followed by ten years to life on supervised release. (Doc. 29, at 21). Defendant's offense, however, was subject to a mandatory minimum term of life imprisonment. (*Id.*). The Court sentenced defendant to life imprisonment followed by ten years on supervised release. (Doc. 35). On February 9, 2007, defendant timely appealed. (Doc. 37). On December 13, 2007, the Eight Circuit Court of Appeals affirmed defendant's sentence. (Doc. 52). On June 11, 2015, the Court on its own motion found defendant was not eligible for a sentencing reduction in light of amendments to the United States Sentencing Guidelines ("USSG"). (Doc. 66). On January 11, 2019, defendant filed a pro se motion to reduce his sentence

in light of the First Step Act, which the Court has not yet ruled on. (Doc. 68). Defendant is currently incarcerated at USP Tucson. (Doc. 83, at 2).

## III.   COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the USSG discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness;

4

(2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

## IV. DISCUSSION

### A. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his medical conditions put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 83, at 5–17). Defendant cites a litany of medical conditions, including his type II diabetes with neuropathy, morbid obesity, obstructive sleep apnea, hypertension, deep vein thrombosis, and chronic open wounds. (*Id.*).

Numerous courts have held a defendant's relevant health conditions and the presence of COVID-19 within the BOP generally, or within the defendant's specific

5

facility, together can constitute an extraordinary and compelling reason for compassionate release. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases). The Centers for Disease Control ("CDC") lists nine categories of people who are at higher risk of severe illness and death from COVID-19: (1) people 65 years or older, (2) people living in a long-term care facility, (3) people with chronic lung disease or moderate to severe asthma, (4) people with a serious heart condition, (5) people with a compromised immune system, (6) severely obese people with a body mass index ("BMI") of 40 or above, (7) diabetic people, (8) people with chronic kidney disease undergoing dialysis, and (9) people with liver disease. *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The latter seven categories apply to "[p]eople of all ages with underlying conditions, particularly if not well controlled[.]" *Id.*

There is little dispute here that defendant has multiple serious health issues which make him susceptible to COVID-19. His medical records from the last two years alone are voluminous. (Docs. 83–1, 83–2, 83–3, 83–4, 83–5, 83–6, 83–7, 83–8, 84, 84–1, 84–2, 84–3, 84–4, 84–5, 84–6, 84–7, 85, 85–1, 85–2, 85–3, 85–4, 85–5, 85–6, & 85–7). His diabetes at times is described as uncontrolled or poorly managed. (Doc. 84, at 87, 233). He has regularly suffered from diabetic ulcers and swelling in his legs. *See, e.g.*, (*Id.*, at 1). Defendant is noted as having "serious vascular problems." (*Id.*, at 194). Defendant has been diagnosed with chronic hypoxemic respiratory failure and has required an external source of oxygen to breath in the past. (Doc. 85, at 8). His hypertension is difficult to control in light of the quantity of medications prescribed to him. (Doc. 84–6, at 103). He at times has required the use of a wheelchair and shown minimal ability to ambulate. *See, e.g.*, (Doc. 84, at 131). His most recent BMI was 55.8. (Doc. 83–4, at 175). His peak BMI in June 2018 was 64.88. (Doc. 84–6, at 5). He has been described as extremely morbidly obese. (Doc. 84–3, at 60). He has been

6

found shivering, shaking, and writhing in his cell by staff on multiple occasions. *See, e.g.*, (Doc. 84, at 11). Defendant has reported 10/10 chronic pain resulting from his ongoing open wounds, diabetes, obesity, and deep vein thrombosis. (Doc. 84–4, at 44). Defendant is regularly in and out of the hospital for various treatments and is classified as a Care Level 3 inmate. *See, e.g.*, (Doc. 85–8, at 3). Defendant was recently housed in a negative pressure chamber due to significant infections. (Doc. 83–1, at 7). In sum, the records overwhelmingly show defendant fits the CDC's risk categories for at least diabetic and obese persons and if not also persons with respiratory, cardiac, or immune system issues.

Currently, there are two active cases of COVID-19 at USP Tucson, both among the staff. *COVID-19*, BOP, https://www.bop.gov/coronavirus/. One staff person has also recovered. *Id.* Although there are no known cases among the inmates, the Court finds the presence of COVID-19 among the staff and throughout the BOP generally presents a significant risk to defendant given his vulnerabilities. *See, United States v. Oltmanns*, No. 09-CR-1016-CJW-MAR, 2020 WL 3453843, at *6 (N.D. Iowa June 24, 2020) (compiling cases); *see also United States v. Wilson*, No. 14-209-1, 2020 WL 1975082, at *2 (E.D. Penn. Apr. 24, 2020) ("Correctional and detention facilities present unique challenges for control of COVID-19 transmissions among incarcerated/detained persons . . . [because they] are at special risk of infection, given their living situations, and may also be less able to participate in proactive measures to keep themselves safe[.]") (internal quotation marks, citations, and original alterations omitted); *United States v. Park*, No. 16-cr-473 (RA), 2020 WL 1970603, at *2 (S.D.N.Y. Apr. 24, 2020) ("The nature of prisons—crowded, with shared sleeping spaces and common areas, and often with limited access to medical assistance and hygienic products—put those incarcerated inside a facility with an outbreak at heightened risk.").

7

Thus, the Court finds the combination of defendant's medical conditions and the status of COVID-19 in the BOP generally presents an extraordinary and compelling reason for early release.

**B.     *Section 3553(a) Factors and Danger to Community***

Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]"  Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release.  Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Defendant has seven prior cocaine-related offenses, eight if his disorderly house offense involving cocaine is counted.  His offenses were not driven by his own addiction. Nothing in the PSR indicates defendant personally used cocaine.  Instead, it appears he sold cocaine simply to "hustle" and make money.  Indeed, he has no employment history. Nothing in his background explains his choice to involve himself in the sale of narcotics. Defendant continually returned to the exact same criminal conduct despite serving incrementally longer sentences and despite being placed on probation or parole.  *See* (*United States v. Tillman*, 6:12-cr-2024-CJW-MAR-14 (Doc. 831) (N.D. Iowa June 30, 2020) (granting release to a defendant, despite her recidivist history of low-level drug offenses and lack of employment history, due to her mitigating upbringing, severe mental

health issues, improvement while incarcerated, and promising release plan)). The instant offense involved violence which shows an escalation in defendant's criminal behavior. Although the instant offense involved only a small amount of cocaine, it is defendant's recidivist behavior that drove his sentence here, not the drug quantity.

It appears defendant's conduct has not improved while incarcerated. He has had thirteen disciplinary reports since 2008, the most recent on record occurring in September 2018. (Doc. 85–8, at 2) (containing defendant's most recent progress report from November 2018). The violations in these reports include fighting with another person on four occasions, possession of a dangerous weapon on three occasions, possession of an unauthorized item on three occasions, and misusing an authorized medication on one occasion in March 2015. (*Id.*). Defendant's recent medical records note multiple occasions when he did not take his medications as prescribed and instead hoarded them over the course of months. *See, e.g.*, (Doc. 84, at 20) ("Spoke with pharmacy and I was informed that [defendant] was noncompliant with [blood pressure] meds and was not taking any of them for months prior to being sent to the hospital."). For example, a November 15, 2018 report notes:

> [Defendant] attempted to divert his pill line medication. See nursing note. When an inmate attempts to divert his medication, he is not taking the medication as it is prescribed. This puts in question his need for the medication for the reason it was prescribed. Also, [defendant] may be hoarding medication to take an excessive amount or in an inappropriate way. Or hoarding medication for a suicide attempt/gesture. For these reasons and [defendant's] safety this medication is discontinued and should not be reinstated.

(*Id.*, at 149). On one occasion, ten different medications were confiscated from defendant, with his physician commenting in a May 17, 2019 report:

> It appears from his medication history in [the Bureau of Electronic Medical Records System] that many of these orders were filled and not used. Since September [defendant] has ordered and picked up 4 months worth of his

9

chronic medications including metoprolol, spironolactone, furosemide, lisinopril, atorvastatin, amlodipine and hydralazine. From the confiscated meds he appears to have kept up to 3 months or more of each of these medications. [Defendant] has had a few extended stays outside hospitals since September which could account for some of this non-compliance.

(*Id.*, at 41). What defendant intended to do with his hoarded prescriptions is unclear.[3] This fact is particularly aggravating because it not only shows defendant's health issues are, to some extent, exacerbated by his willful noncompliance with treatment but also that defendant continues to, at best, mismanage drugs. This pattern is observable starting as early as his March 2015 report for misusing an authorized medication and as recently as a year ago. The Court also notes that, although defendant took a significant amount of education courses when he first arrived at prison, his interest in education waned substantially thereafter. If released, defendant intends to reside in home confinement with his brother in Chicago, who is prepared to provide defendant with any needed transportation for medical or other appointments. (Doc. 91, at 6-7; 91–2). Although this release plan appears promising, defendant does not indicate whether his brother has any criminal history. (*Id.*).

In short, the lack of mitigating circumstances here leaves the Court with no appropriate avenue by which to grant release. Defendant's argument on the 3553(a) factors is merely that his sentence was harsh. Undoubtedly, life imprisonment is a harsh sentence. Reasonable minds can disagree about whether defendant earned that sentence through his recidivist criminal conduct. Whether the Court finds defendant's sentence harsh, however, is not the question. Instead, the question is whether defendant's fourteen

---

[3] The government argues defendant intended to give or exchange his hoarded medications with others. (Doc. 87, at 18). Although this is probable, nothing in the record except defendant's drug dealing criminal history supports the conclusion. Defendant submits it is possible "he was coerced into" hoarding his medications. (Doc. 83, at 13). Although this is possible, nothing in the record supports this extremely unlikely conjecture.

Case 1:06-cr-00053-CJW-MAR   Document 95   Filed 07/10/20   Page 10 of 11

years of incarceration has satisfied the goals of 3553(a) in light of his present health conditions amid the pandemic. Although defendant's criminal history consists of low-level drug distribution, his repetition of this conduct comes without mitigation. Defendant's reports from prison reflect that, despite the passage of fourteen years, he still requires deterrence. This is exemplified in defendant's continued diversion of drugs, even in his current medical state. Aside from the mere passage of time, the Court has no basis to conclude the goals of 3553(a) have been satisfied at this time such that it is appropriate to afford defendant an exponential reduction in his sentence.

Weighing all the factors under Section 3553(a), the Court finds release inappropriate. Although defendant faces greater danger than the average inmate from the COVID-19 pandemic, and although that danger could likely be mitigated if the Court released him early from prison, defendant's lifetime pattern of criminal conduct and continued disciplinary issues while incarcerated make him a danger to the community such that the Court finds early release unjustified. *See Oltmanns*, 2020 WL 3453843, at *7 (denying release based on the 3553(a) factors despite the defendant's health).

## V.    CONCLUSION

For these reasons, defendant's Motion for Compassionate Release (Doc. 82) is **denied**. Defendant must serve the remainder of his term of imprisonment as previously directed. (Doc. 35).

**IT IS SO ORDERED** this 10th day of July, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

11